IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BETTY A. REED,

                Plaintiff,

                v.                                    Civil Action No. 5:05-CV-125

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.      Background

        Plaintiff, Betty A. Reed, (Claimant), filed her Complaint on August 12, 2005, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on September 29, 2005.[2]

Claimant filed her Motion for Summary Judgment and Memorandum in Support of Motion for

Summary Judgement on October 31 , 2005.[3]  Commissioner filed her Motion for Summary Judgment

and Brief in Support on November 17, 2005.[4]  Claimant filed her Response to Motion for Summary

Judgement on December 1, 2005.[5]

----

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 9.

[4] Docket No. 12

[5] Docket No. 13.

B.     The Pleadings

          1.     Claimant's Motion for Summary Judgment and Memorandum in Support.

          2.     Commissioner's Motion for Summary Judgment and Brief in Support Thereof.

          3.     Claimant's Response to Summary Judgment.

     C.     Recommendation

          I recommend that Claimant's Motion for Summary Judgment be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED  because the ALJ was substantially justified in his decision.  Specifically, the ALJ (1) properly weighed and explained the weight he gave to the treating source opinions; (2) properly relied upon Vocational Expert testimony to find that Claimant could perform her past relevant work;  and (3) properly evaluated Claimant's obesity.

## II.  Facts

A.     Procedural History

           On January 21, 2003, Claimant  filed for Disability Insurance Benefits alleging disability since June 30, 2002.   The application was denied initially and on reconsideration.  A hearing was held on December 1 , 2003 before an ALJ.  The ALJ's decision, dated May 27, 2004, denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on June 20, 2005.  This action was filed and proceeded as set forth above.

B.     Personal History

          Claimant was 57 years old on the date of the December 1, 2003 hearing before the ALJ. Claimant has a high school education and a real estate license and past relevant work experience as

a secretary/receptionist, a housing specialist and an office assistant.

C.      Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: June 30, 2002–May 27, 2004.

**Travis Physical Therapy and Sports Medicine, Inc., 7/1/02, Tr. 228-236**
Assessment: mid-lower back pain/discomfort; chronic musculoskeletal pain/discomfort.

**Family Practice Resident/Faculty, 6/5/02-1/23/03, Tr. 237-254**
Assessment: Somatic dysfunction.

**United Hospital Center, 12/26/02, Magnetic Resonance Imaging of the Cervical Spine, Tr. 255**
Impression: unremarkable study.

**United Hospital Center, 12/31/02, Magnetic Resonance Imaging of Brain, Tr. 256**
Impression:    1.    Linear signal hyperintensity seen in the left corpus callosum and periventricular region without Gadolinium enhancement. Demyelinating process cannot be excluded.
            2.    Small amount of fluid in the left maxillary sinus.

**United Hospital Center, 8/27/02, Cervical Spine, Tr. 260**
Impression: Mild scoliosis and degenerative changes.

**John F. Brick, M.D., 1/31/03, Tr. 285-286**
No objective evidence of neurologic dysfunction.

**Physical Residual Functional Capacity Assessment, 3/6/03, Tr. 287-294**
EXERTIONAL LIMITATIONS
Occasionally lift and/or carry, 20 pounds;
Frequently lift and/or carry, 10 pounds;
Stand and/or walk, about 6 hours in an 8-hour workday;
Sit for a total of about 6 hours in an 8-hour workday;
Push and/or pull, unlimited.

POSTURAL LIMITATIONS
Climbing, never.
Balancing, stooping, kneeling, crouching, crawling: occasionally.

MANIPULATIVE LIMITATIONS
None established

VISUAL LIMITATIONS
None established

COMMUNICATIVE LIMITATIONS
None established

ENVIRONMENTAL LIMITATIONS
Extreme cold, extreme heat, hazards: avoid concentrated exposure.
Wetness, humidity, noise, vibration, fumes: unlimited.

**Psychiatric Review Technic, 3/18/03, Tr. 295-308**
Affective Disorder
Depression (a medically determinable impairment is present that does not precisely satisfy the
diagnostic criteria above).

Anxiety-Related Disorder
Anxiety (a medically determinable impairment is present that does not precisely satisfy the
diagnostic criteria above).

"B" Criterial of the Listing
All categories, mild.
No episodes of decompression.

"C" Criterial of the Listing
Evidence does not establish the presence of the "C" criterion.

**B.G.Thimmappa, M.D., 6/7/03, Tr. 311-317**
Impression:    1.    History of chronic fatigue syndrome and fibromyalgia.
               2.    History of allergy to chemicals.
               3.    History of chronic headaches.
               4.    History of chronic sinus infection.
               5.    History of anxiety depression and panic attacks.

**William Fremouw, Ph.D., 6/11/03, Tr. 318-321**
Diagnoses:
Axis I:                Anxiety disorder NOS-mild;
                       Dysthymia, past mild.
Axis II:        No diagnosis.
Axis III:       Fibromyalgia and chronic fatigue syndrome.

**Psychiatric Review Technique, 7/7/03, Tr. 322-335**
Affective Disorder
Decreased energy, Dysthymia (a medically determinable impairment is present that does not
precisely satisfy the diagnostic criteria above).

Anxiety-Related Disorder
Anxiety (a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above).

"B" Criterial of the Listing
Difficulties in maintaining social functioning, mild.
Other categories, none.
No episodes of decompression.

"C" Criterial of the Listing
Evidence does not establish the presence of the "C" criterion.

**Physical Residual Functional Capacity Assessment, 7/7/03, Tr. 336-343**
EXERTIONAL LIMITATIONS
Occasionally lift and/or carry, 50 pounds;
Frequently lift and/or carry, 25 pounds;
Stand and/or walk, about 6 hours in an 8-hour workday;
Sit for a total of about 6 hours in an 8-hour workday;
Push and/or pull, unlimited.

POSTURAL LIMITATIONS
None established.

MANIPULATIVE LIMITATIONS
None established

VISUAL LIMITATIONS
None established

COMMUNICATIVE LIMITATIONS
None established

ENVIRONMENTAL LIMITATIONS
Hazards: avoid concentrated exposure.

**Kiren Kresa-Reahl, M.D., 5/12/03, Tr. 349-350**
Diagnosis: mixed headache disorder.

**Family Practice Resident/Faculty, 5/2/03-8/23/03, Tr. 351-361**
Fibromyalgia, lumbar spine strain, MFR

**Mary Mikowski, M.D., 4/2/03-10/29/03, Tr. 362-364**
Fibromyalgia, depression, anxiety.

**Rod McCullough, M.A., 9/5/03, Tr. 365-368**
Diagnoses:
Axis I:                   Major depressive disorder, single episode moderate.
                          Pain disorder associated with both psychological factors and a general medical
                          condition.
                          Anxiety disorder, NOS.
Axis II:       No diagnosis.
Axis III:      See medical records.

**Salem Family Medicine, Inc., 11/26/03, Tr. 369**
Fibromyalgia with chronic fatigue, extreme asthmatic reaction, depression, anxiety.

**Robert Snuffer, D.O., 12/19/03, Tr. 370-371**
Migraine headaches, depression and anxiety, chronic fatigue, fibromyalgia, chronic sinusitis,
somatic dysfunction in her neck, shoulders and back.

**Family Practice Resident/Faculty, 10/8/03-12/22/03, Tr. 417-428**
Fibromyalgia, lumbar spine strain, back pain.


D.      Testimonial Evidence

1. Claimant

        Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 439-477):

        A       Well, basically I know that I'm not physically or emotionally able to work.  I

would, I would be working but I mean my thought process I just don't feel like I'm capable in the

respect.

        Q       You have to, but you have to be more detailed and tell me why - -

        A       Oh - -

        Q       - - you're not capable.

        A       Well, for one thing I just, depending on what I'm exposed to, I know there's a

chemical exposure problem.  There's times when I'm confused.  I have short term memory

problems.  I just, you know, feel because of that I'm not the same person or, you know, because I

had jobs of responsibility before - -

Q　How long have you had the short term memory problems?

A　Well, probably on and off for a year and a half or so but they just gotten progressively worse.  And then I took a Civil Service test and I failed the Service Test because I couldn't comprehend and I knew basically something was wrong that I - -

Q　When did you take that - -

A　That was the summer before, let me think, maybe September or October of last year.

\*　　　　\*　　　　\*

Q　Now you say you have problems with exposures?

A　Yes.

Q　What kind of problems?

A　Perfumes, cigarette smoke, spraying for termites.  I just, I get real bad headaches, shortness of breath, blisters in my throat.  Just multitudes of symptoms.

\*　　　　\*　　　　\*

A　- - Lysol sprays, Clorox.  Well, I'm really allergic to mold and that was my last exposure was the job.  There was a lot of mold and that's when I really started to notice just a lot of problems especially with my memory and my coordination and things like that.

Q　What kind of problems were you having with your coordination?

A　Just, it would just - - my hands, just like I couldn't control them.  I would drop things and just unable to type and do things that I used to do.

Q　Can you use a knife and fork to like eat?

A       Yeah, most days, yeah.

Q       Okay, Well, what happens on other days?

A       Well, I mean I might throw them or drop them or whatever but, yeah.

Q       How about, can you hold a cup of coffee or glass of milk in either hand?

A       I can hold it, yeah, it doesn't mean I don't spill it on me sometimes.

Q       Um-hum.  Do you have any problems with walking?

A       Yes, I do.

Q       How far can you walk at a stretch?

A       I have a driveway that's probably maybe 200 feet and I've had problems walking. When I come back I can hardly breathe and I'm just, you know, just wore out, totally wore out. And I used to walk four miles a day and I just cannot.  I mean I can't shop.  I get let out at the door to go in the grocery store and so not far.

                        *                 *                 *

Q       Now where is the pain located?

A       The pain that I have all the time is in my, what do you call this, left - -

Q       Hip or buttock or - -

A       Hip, hip, yeah, hip and the neck.  I always have trouble in my neck and my right shoulder.  And that's, I mean - - but there are days you have it all over, I mean it's, you know - -

                        *                 *                 *

Q       In your left hip and your neck and your right shoulder you have it all the time?

A       All the time to some degree, yes.

Q       Okay.  And other areas other times?

A      Yes.

                     *           *           *

Q      Okay.  Now are you being treated for anything other than the fatigue, migraines, and the fibromyalgia?

A      Depression.

                     *           *           *

Q      Okay.  How does the depression and anxiety affect you?

A      Well, the fact that I don't want to do or go anywhere or do what I used to do.  And the anxiety that I've had problems driving and - -

Q      What kind of problems have you had driving?

A      Well, panic attacks to where I have to pull over and can't drive myself even home.  Or I - - or go into unknown places.   But I've even had problems just back and forth to work.

Q      How often does this happen?

A      Well, when I was working, it would depend.  I mean road, I mean rains and road conditions and different things kind would trigger it.  It would depend.  But enough that it was always there, I mean I was always kind of in knots anticipating, you know, driving.

Q      Does anything make the depression or anxiety worse?

A      Well, life things that you contend with, yes.

                     *           *           *

Q      - - you mentioned them earlier.  How often do you have migraines?

A      Well, that depends, usually about three or four a month I'd say maybe.  It depends on what triggers them.  I mean sometimes, sometimes they'll last three or four days.  It depends

on what it is that causes me to have one.

Q        What kinds of things cause the migraines?

A        Noise, smells, odors, chemicals, weather change.

*                *                *

Q        What kind of problems do you have with breathing or allergies?

A        Well, I have a lot of allergies to a lot of things.  I also have a lot allergies to food.

But I - - the breathing problems kind of came on with the sensitivity to things or stress or heat or

cold.        Q        When you say stress what kinds of things cause - - can you give me some

examples?

A        Well, like I said, stress from somebody being sick or from something being put on

me to do and I have problems doing it or don't feel like doing it or something like that.

*                *                *

Q        Now with regard to the fibromyalgia that you've testified to, what does that mean

to you that you have fibromyalgia?  What are the symptoms and what do you live with when

someone says you have fibromyalgia?

A        Well, you live with just - - you can't plan anything because day to day to you have

no idea what - - how you're going to feel.  You don't know what's going to trigger it.  There - - I

mean mostly usually of the morning when I get up I can't hardly walk through the house.  And

then if I do have a day where I feel better then if I try to do more than I'll have another flare up,

you know, from that.  And it's, it's just bad stuff.

Q        So does that encompass the fatigue and the muscle pain - -

A        Oh, yes - -

Q        - - and just a little bit of everything, right?

A        - - definitely.  Yes, right.  The fatigue has just been, I mean I've never just experienced to this degree before.

*                  *                  *

Q        Maybe you can explain in a little more detail for the court what are some of the things related to your physical problems that bring on these anxiety attacks and the depression that you suffer?

A        Well, just the fact that, you know, you know that it's never going to go way and you know how limited your life is.  And the things that you don't get to do.  I mean and I don't get to enjoy my grandson or my children.  And I can't just take off and go shopping and do the things that normal, you know, people do that I enjoyed doing before.

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 477-488):

Q        Mr. Czugman, can you please assess the claimant's past jobs for the last 15 years by job title, exertional level, skill level, and any transferabililty of skills?

A        Okay, the work as the secretary is recognized as sedentary exertional.  Specific vocational preparation is six, therefore, skilled work.  And we're looking at skills working with data  such as calculating, checking for accuracy, classifying, comparing, compiling, detailed orientation.  Would you like the jobs they would transfer to now or at the end, sir?

Q        Well, it depends.  For right now let's just go on the other past relevant work.

A        Okay.  The work as the office manager is recognized as sedentary.  Specific

11

vocational preparation is seven. And the skills involved with that are working with data, again. You have the analyzing, calculating, computing, checking for accuracy, classifying, comparing, compiling, detailed orientation skills. You have managerial skills, supervisory skills. That's working with people actually the managerial and supervisor. The skill - - okay, the job working as the housing specialist. Now a housing specialist is recognized - - it's customarily a light exertional, sir. Specific vocational preparation eight, skilled job - -

Q       SVP eight?

A       Yes, sir.

Q       Okay.

A       Now I will state, with the DOT, they're saying light. The claimant's testimony appears to put it at a sedentary actually.

Q       Okay.

A       But customarily it is considered a light position.

Q       Okay.

A       And with that you have skills working with people. You have interviewing skills, listening skills, also supervisory skills with that job. Skills working with data such as analyzing data, classifying, comparing, compiling, research skills involved with that, evaluating, recording information skills. Then the other position, the medical billing clerk, that's recognized as sedentary exertional, SVP four so we're talking about semi-skilled. And you have skills working with data there. You have calculating, computing, checking for accuracy, comparing, compiling - -

Q       Wait a minute, I'm confused. What - - where is the secretary job?

A       Okay, in the file, there in that green form, it says secretary/office manager, January '83 through November '96.  Then it has November '96 through August '98, secretary/receptionist.

ALJ       Were - - oh, did you do both of those jobs at the same place?

CLMT       I'm sorry, what was that, Your Honor?

ALJ       Did you - - were you both a secretary, a office manager and a secretary/receptionist at the mental health center?

CLMT       Well, at the satellite office and then I was transferred into the other office in Clarksburg, in the main office, and in order to have a job, yes, I was a secretary/receptionist there.

ALJ       And what did you do as a secretary/receptionist?

CLMT       Made appointments, collected money - -

ALJ       So you were out - -

CLMT       - - and the mail - -

ALJ       - - dealing with the public constant, pretty much constantly?

CLMT       Right.

ALJ       Okay.

VE       Okay.  The receptionist, sir, that's sedentary exertional, SVP four, semi-skilled.  And you do have the work working with people, communication skills and also recording information skills?

BY ADMINISTRATIVE LAW JUDGE:

Q       Okay, let me give you a hypothetical question.  Let me - - if we assume a person

13

of the same age, education, and work experience as the claimant in this case but assume a person who's able to do, say, sedentary work, as that's defined in the Commissioners regulations. But there would be no exposure to significant work place hazards like heights or dangerous moving machinery. And no exposure to more than minimal levels of fumes, dust, gases, perfumes, cleaning fluids, and the like. And assume the person should be able to stand briefly to change position. And by briefly I mean just for a minute or two at least every half hour. Would such a person be able to do any of the, and no exposure to extreme heat or cold, would such a person be able to do any of the past jobs?

A    Well, customarily the secretary, the office manager, the medical billing clerk also.

Q    Would any of theses jobs involve climbing ladders, ropes, or scaffolds?

A    Not part of the job, no, sir.

Q    Okay. Would any of these jobs involve more than occasional stairs or ramps?

A    No sir.

Q    Any involve more than occasional balancing, stooping, kneeling, crouching, or crawling?

A    No, sir.

Q    Okay. Would there be any other jobs such a person could go to that would involve transferable skills from any of the past jobs where the skills would be very easily transferable without significant adaptation and change in industry or change in work tools or things like that?

A    Credit card clerk. It's a sedentary, SVP three so we're talking about low semi-skilled. And the skills involved in that would be the interviewing skills, the recording information.

14

Q        Um-hum.

A        There's 75,000 national.  In the region you have 100.  Payroll clerk.  No, you know what, Your Honor, I'm taking the payroll clerk off of that.

Q        Okay.

A        Sorry.  Insurance claim clerk.  It's semi-skilled.  Now you're looking at 75,000 national - -

Q        What's the SVP?

A        I'm sorry, SVP three, no SVP four.

Q        Okay.

A        Sorry, sir, I have it here - -

Q        75,000 - -

A        75,000 for the national.  For the region you're looking at 300.  I would say that's basically it right there that would easily transfer to.

Q        Okay.  Mr. Malcolm - - oh, wait a minute, I just have one other.  Is your testimony consistent with the DOT?

A        In general, sir.   And the reason for that is the DOT is a little bit outdated.  The last addition is 1991 and it included specific industries and in order to do a labor market survey you have to expand other industries that uses those same type of jobs.  In addition, when they clustered descriptions in the DOT they used the maximum requirement for each job.  And when broken down I use what the actual requirement would be for the job that was mentioned.

Q        Okay.  And how many days, if any, can a person miss work and still be able to do these jobs?

A        Well, the semi-skilled jobs I would say if the person missed more than two days a month consistent that they would not have a job to go to.   With the skilled ones such as the housing specialist I would say the person could miss as much as three days a month with that but no more.

*          *          *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        The two jobs that you mentioned for transferable - -

A        Um-hum.

Q        - - jobs, the credit card clerk and the insurance claim clerk - -

A        Yes.

Q        - - you believe that is the exhaustive list?

A        No, it's an example that - -

Q        Okay.

A        - - I used for that.

Q        Okay.  So are those semi-skilled jobs?

A        Yes, they are.

Q        Okay.  So the skilled job that you're referring to is the office manager and the housing specialist?

A        That's correct.

Q        Okay.  And so in her past work she could return to these jobs if she didn't miss, or a claimant didn't miss more than three days - -

A        That was - -

Q        - - and the skilled was two days?

A        Yeah, and the reason I say that is there's a lot of work that those people can bring home to work on to make up for the time so it's customarily at maximum of three.

Q        But you believe that anymore than three, even being able to bring work home, it would be unacceptable?

A        Yes, I do.

Q        What percentage of a day could an employee be off task due to various impairments or dealing with symptoms and still remain employable?

A        Okay.  It becomes a lesser percentage to be off task with the skill.  And by that, a job such as the housing specialist where you're looking at a skill, an SVP eight - - let me see if I do have that right there, yeah.  An individual like that has a lot of detail orientation involved, they can't afford to make mistakes.  You're looking at an individual that's going to be productive during the day.  I would say with a skill level at that length if the individual, besides the regular, taking a regular break of 15 minutes in the morning, 45 minutes in the afternoon, 15 minutes in the late afternoon, I would say maximum in a day an additional 15 minutes.

Q        Okay, so outside the normal breaks 15 minutes off task, anything more than that would be unacceptable?

A        Right, I would say so.  And, you know, we're talking about productivity and it becomes a fine line.  Being off task and making mistakes.  You know being off task is one thing but you have to be able to be detailed orientated.  You can't afford to make a mistake because these are jobs that cost the company money when a mistake is making - - made, sorry.  Good English.

17

ALJ     Now that's the SVP eight job.  How about the other, the lower SVP jobs that you testified to?

VE      That she performed?

ALJ     Yeah, and - -

VE      Okay.

ALJ     - - and the - -

VE      Transferabililty - -

ALJ     - - and the transferable, yeah, both.

VE      Okay.  With the secretary, that's SVP six, I would say it's the same thing.  With the office manager it would likewise be.  With the medical billing clerk we're looking at more than a productivity issue there because it is semi-skilled.  And by that an individual would have to at least perform 45 minutes for every hour that they're doing the work.  But, again, you can't make mistakes and you have to be productive for at least that 45 minutes for every hour.  And that means that an individual, at a minimum, is doing something that's equivalent to 45 minutes of work for every hour they're sitting at their desk.

BY ATTORNEY:

Q       So at the higher - -

A       Um-hum.

Q       - - skilled level jobs there'd be less tolerance for lapses in concentration and persistence and pace than there would at the lesser skill?

A       Yes, because you're responsible for other people and that makes a big difference.

Q       How would the jobs that you've named be affected if a person were required to

minimize or avoid contact with the general public for both reasons of chemical sensitivity as well as avoiding flare ups of illness?

A    Well, the housing specialist is going to be prevented. The office manager has a responsibility to deal with the public with that office too so I would say that would be prevented.

Q    [INAUDIBLE] - -

A    The office manager - -

Q    Okay.

A    - - customarily secretary and medical billing clerk would not be.

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•    Can walk, 400 feet (Tr. 452).

•    Can stand, 5-20 minutes (Tr. 452).

•    Can sit, 10 minutes (Tr. 452).

•    Can lift, 5 pounds (Tr. 452).

•    Reads the newspaper (Tr. 467).

•    Does some cooking (Tr. 468).

•    Does the laundry (Tr. 469).

•    Goes grocery shopping (Tr. 469).

•    Naps (Tr. 471).

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) by failing to properly weigh and explain the weight given to the treating source opinions; (2) by improperly relying upon Vocational Expert testimony to find that Claimant could perform her past relevant work; and (3) by failing to conduct a proper credibility analysis.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ (1) properly weighed and explained the weight given to the treating source opinions; (2) properly relied upon Vocational Expert testimony to find that Claimant could perform her past relevant work; and (3) conducted a proper credibility analysis.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review. Only a final determination of the Commissioner may receive judicial

review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.    Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are

unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion


1.  THE ALJ ERRED BY FAILING TO PROPERLY WEIGH AND EXPLAIN THE WEIGHT GIVEN TO THE TREATING SOURCE OPINIONS.

Claimant alleges that the ALJ erred by failing to properly weigh and explain the weight given to the treating source opinions.  The Commissioner counters that the ALJ properly evaluated and explained the weight given to the treating sources opinions.

All medical opinions are to be considered in determining the disability status of a

claimants. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. The opinion of Claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984). Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). While the credibility of the opinions of the treating physician is entitled to great weight, it will be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984).

Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the

treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001).

Although the ALJ is required to indicate the weight given to all relevant evidence, <u>Gordon v. Schweiker</u>, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit does not require that the ALJ discuss every piece of evidence.[6] It has been repeatedly recognized that the ALJ's "duty of explanation is not intended to be a mandate for administrative verbosity or pedantry. If a reviewing court can discern 'what the ALJ did and why he did it,' the duty of explanation is satisfied." <u>Piney Mountain Coal Co. v. Mays</u>, 176 F.3d 753, 762 n. 10 (4th Cir. 1999) (citing <u>Lane Hollow Coal Co. v. Director, OWCP</u>, 137 F.3d 799, 804-805 (4th Cir. 1998)). Therefore, this Court must examine the record to determine whether there is substantial evidence for the ALJ's decision. As was stated above, the Court will not re-weigh or reappraise that evidence.

Claimant first asserts that the ALJ failed to explicitly indicate that weight he accorded to Dr. Mikowski and Dr. Sniffer's opinions. Claimant's argument has no merit. The ALJ considered Dr. Mikowski's report and specifically rejected Dr. Mikowski's opinion that Claimant is debilitated. Specifically, the ALJ stated that "[a]llegations that the claimant is disabled or temporarily disabled from all work activity are not credible. The claimant's treating physician states that the claimant is debilitated (Exhibit 28F)." (Tr. 31.) With respect to Dr. Snuffer, the

---

[6] The Undersigned notes that the Seventh Circuit has held that a written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence. <u>See</u> <u>Green v. Shalala</u>, 51 F.3d 96, 101 (7th Cir.1995). Also, the Eighth Circuit has held that the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it. <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir.1998). <u>See</u> <u>also</u>, <u>Walker v. Secretary of Health and Human Services</u>, 884 F.2d 241, 245 (6th Cir.1989)(reviewing court many examine all the evidence, even if it has not been cited in the Secretary's decision).

ALJ specifically stated that he "cannot credit Dr. Snuffer's report that the claimant is temporarily totally disabled or maybe permanently disabled (Exhibit 29F)." (Tr. 31.) Accordingly, the Court finds that the ALJ did not fail to indicate the weight he gave to Dr. Mikowski and Dr. Snuffer's opinions.

The Court, however, must still determine whether there was substantial evidence to support the ALJ's decision not to credit Mikowski and Dr. Sniffer's opinions. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id.

The ALJ here adequately articulated specific justification for discounting Dr. Mikowski and Dr. Snuffer's opinions. For example, the ALJ stated that Dr. Mikowski:

> ...[A]sserts that the claimant has been quite sedentary, which the undersigned is partially in agreement with. She states that the claimant cannot work but this is a conclusion for the Commissioner (SSR 96-5p), and it is inconsistent with the other medical evidence. She relies, in part, on the report of Mr. McCullough (Exhibit 27F), which seems not well supported and contradicted by Dr. Fremouw (Exhibit 19F). Mr. McCullough's reports seems, as noted above, internally inconsistent, at a minimum in regard to claimant's social functioning. (Tr. 31.)

With respect to Dr. Snuffer, the ALJ noted the following:

> He accepts the claimant's reports of four or five migraine headaches a month. His statement that he cannot rule out multiple sclerosis seems contradicted by other physicians who do rule out multiple sclerosis (Exhibit 14F); and there has certainly not been any treatment for that as yet. (Tr. 31.)

The fact that the ALJ did not accept as credible Dr. Mikowski and Dr. Snuffer's opinions

does not mean that he ignored them.[7]  Nor is the fact that the ALJ did not evaluate in his written

decision every single piece of evidence fatal to his findings.  As indicated above, case law in this

Circuit does not require the ALJ to evaluate in writing every piece of evidence in the record, nor

does it require an ALJ to spell out every step in his reasoning, provided he has given sufficient

direction as to the basis of his findings.  Piney Mountain Coal Co. v. Mays, 176 F.3d 753, 762 n.

10 (4th Cir. 1999) (citing Lane Hollow Coal Co. v. Director, OWCP, 137 F.3d 799, 804-805 (4th

Cir. 1998)).  In this case, the ALJ examined the remaining medical source opinions and  provided

sufficient direction as to the basis for his findings, which are supported by the medical and

testimonial evidence in the record.

Specifically, the ALJ found that Dr. Mikowski and Dr. Snuffer's opinions were not

consistent with the other medical evidence of record and appeared to be based on Claimant's

subjective complaints.  For example, none of the specialists, including Dr. Brick, Dr. Reahl and

Dr. Bland, opined that Claimant was incapable of performing all work.  Although Dr. Reahl

_____

[7] Claimant alleges that the ALJ failed to account for Claimant's fibromyalgia, chronic
fatigue and depression, which were included in the opinion of Dr. Mikowski and, therefore, the
RFC was "fatally flawed."  (Pl's Res. to Def.'s Motion for S. J. at 4; see also Pl. Br. at 11.)
However, the ALJ specifically considered Claimant's fibromyalgia, chronic fatigue,
depression/anxiety and found that they "could reasonably be expected to produce some of the
symptoms alleged by the claimant."  (Tr. 30.)  The ALJ noted, however, that Claimant's medical
treatment record did not establish that she had "the functional limitations, or clinical/laboratory
findings demonstrated on physical examination, required for her ... fibromyalgia; chronic fatigue;
... depression/anxiety ... to meet the severity, alone or in combination, of section 1.02, 1.03, 1.04,
1.05, 3.03, 11.03 and 14.08 of the Listing of Impairments, or any other Listing."  (Tr. 29.)  In this
case, the ALJ made a RFC based on several factors, including Claimant's testimony, reports of
consulting and treating physicians and his comprehensive review of the medical evidence of
record.  (Tr. 30.)  It is the duty of the ALJ to resolve conflicts in the evidence.  Hays, 907 F.2d at
1456.  This Court cannot say that, in light of the evidence of record and the evidence outlined in
the ALJ's decision, there was not substantial evidence for the ALJ's determination of Claimant's
RFC.

requested that Claimant keep a headache calendar and note her response to different medication on her pain (Tr. 310, 349), the record does not reflect that Claimant ever submitted copies of the headache calendar or documented medication response. Additionally, Dr. Brick's records do not provide any support regarding the frequency and duration of Claimant's headaches. (Tr. 285.) Finally, the opinions of disability of Dr. Mikowski and Dr. Snuffer were contradicted by the examination findings of Dr. Thimmappa (Tr. 311-314) and Dr. Fremouw (Tr. 318-321). Because these reasons are sufficiently specific and legitimate pursuant to the Commissioner's regulations, the Court finds that the ALJ properly applied the law in not giving controlling weight to Dr. Mikowski and Dr. Sniffer's opinions.

## 2. THE ALJ ERRED BY IMPROPERLY RELYING UPON VOCATIONAL EXPERT TESTIMONY TO FIND THAT CLAIMANT COULD PERFORM HER PAST RELEVANT WORK.

The Court need not consider this assignment of error because Claimant's counsel has withdrawn his argument as to this issue. (Pl.'s Res. to Def.'s Motion for S. J. at 6.)

## 3. THE ALJ ERRED BY FAILING TO CONDUCT A PROPER CREDIBILITY ANALYSIS.

Claimant asserts that the ALJ erred in determining her credibility. Commissioner counters that the ALJ properly determining Claimant's credibility.

Unfortunately for Claimant, her argument is without merit. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)).

"Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). The ALJ must apply a two-step analysis when assessing the credibility of a claimant's subjective complaints of pain. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996); SSR 96-7p.

In this case, the ALJ correctly applied the Craig test. The ALJ found that "[t]he claimant's vertebrogenic disorder; chronic migraine headaches; fibromyalgia; chronic fatigue; chronic sinusitis; depression/anxiety; rosacea; and chemical sensitivity could reasonably be expected to produce some of the symptoms alleged by the claimant." (Tr. 30). This satisfies the first prong of Craig.

The ALJ then considered Claimant's subjective complaints of debilitating symptoms in light of the entire record in accordance with the second prong of Craig. The ALJ, who evaluated the entire medical record and thoroughly discussed the evidence of record (Tr. 17-32), stated that Claimant's medical record "does not establish that the claimant has the functional limitations, or clinical/laboratory findings demonstrated on physical examination, required for her vertebrogenic disorder; chronic migraine headaches; fibromyalgia; chronic fatigue; chronic sinusitis; depression/anxiety; rosacea; and chemical sensitivities to meet the severity, alone or in combination, of section 1.02, 1.03, 1.04, 1.05, 3.03, 11.3, and 14.08 of the Listing of Impairments, or any other Listing." (Tr. 29.) The ALJ further noted that Claimant engages in

"significant daily activities." (Tr. 30.)    Additionally, the ALJ was in the best position to observe

Claimant at the hearing and evaluate her credibility.  In this regard, the ALJ stated that Claimant's

testimony was "partially credible, to the extent that her capacity to perform the exertional and

non-exertional requirements of even sedentary work is slightly eroded." (Tr.30.)  The ALJ

concluded that Claimant retains the ability to perform limited sedentary level work.  (Tr. 32.)

This satisfies the second prong of <u>Craig</u>.

     Having considered all the evidence in accordance with <u>Craig</u>'s test, the ALJ, is in the best

position to determine Claimant's credibility.  The ALJ discussed the objective medical evidence

in detail and applied the appropriate standard for evaluating Claimant's symptoms.  <u>See</u> 20  C.F.R.

§ 404.1529.  This regulation tells the ALJ to consider Claimant's symptoms, but only to the

extent they are consistent with objective medical evidence.  <u>Id</u>.  Although the ALJ determined

that Claimant had medically demonstrable severe impairments, the ALJ also determined that

Claimant's testimony was not fully credible and inconsistent with her medical record.  (Tr. 29-

30.)  Accordingly, the ALJ properly assessed Claimant's credibility.

## IV.  Recommendation

     For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment

be DENIED and that the Commissioner's Motion for Summary Judgment be GRANTED

because the ALJ was substantially justified in his decision.  Specifically, the ALJ (1) properly

weighed and explained the weight he gave to the treating source opinions; (2) properly relied

upon Vocational Expert testimony to find that Claimant could perform her past relevant work;

and (3) properly evaluated Claimant's obesity.

     Any party who appears *pro se* and any counsel of record, as applicable, may, within ten

(10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: May 30, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE